# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v WANG

Docket No. 158013. Argued on application for leave to appeal November 7, 2019. Decided May 13, 2020.

Xun Wang was convicted following a bench trial in the Ingham Circuit Court, Rosemarie E. Aquilina, J., of two counts of Medicaid fraud under MCL 400.607 of the Medicaid False Claim Act (MFCA), 400.601 *et seq.*, and one count of unauthorized practice of a health profession under MCL 333.16294 of the Public Health Code, 333.1101 *et seq.* Defendant was from China, where she had previously earned a medical degree and completed two years of a three-year residency program. She moved to the United States in 2001, after which she earned a Ph.D. in basic medical science. In 2013, defendant began a two-month student rotation through the AmeriClerkships program working in the Livernois Family Clinic, which was owned by Dr. Murtaza Hussain. After completing her student rotation, defendant volunteered at the clinic before eventually becoming a part-time employee. Notwithstanding her education in the United States and abroad, defendant was never licensed to practice in a health profession in this country. The Michigan Department of the Attorney General's Health Care Fraud Division discovered that a high volume of narcotics prescriptions were being written at the clinic, and in 2014, the department conducted an investigation, during which Drew Macon and Lorrie Bates, special agents with the department, separately went to the clinic while posing as patients with Medicaid benefits. Defendant saw both agents when they posed as patients, identified herself as Hussain's assistant, and took written notes of their medical histories. Defendant also performed physical examinations, answered their questions, and wrote prescriptions for both agents on a prescription pad that Hussain had previously signed, including a prescription for Ambien, a Schedule 4 controlled substance. The patients' notes were entered into the clinic's computer system and were electronically signed by Hussain; the notes indicated that both defendant and Hussain had seen the agents. The Medicaid processing system reflected that claims were submitted for both agents' treatment and were paid to Hussain for a total of $260. Defendant was charged with two counts of Medicaid fraud under MCL 400.607 and one count of unauthorized practice of a health profession under MCL 333.16294. The trial court sentenced her to concurrent terms of 365 days in jail for each conviction, which was suspended upon the successful completion of five years' probation and the payment of $106,454 in fines and costs. Defendant appealed. In an unpublished per curiam opinion issued on May 10, 2018 (Docket No. 336673), the Court of Appeals, METER, P.J., and GADOLA and TUKEL, JJ., affirmed defendant's convictions but vacated the trial court's imposition of fines and remanded for resentencing to allow the trial court to articulate why the amount assessed in fines was proportionate. Defendant sought leave to

appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 503 Mich 987 (2019).

In an opinion by Justice ZAHRA, joined by Chief Justice MCCORMACK and Justices VIVIANO, BERNSTEIN, CLEMENT, and CAVANAGH, the Supreme Court, in lieu of granting leave to appeal, *held*:

Defendant was not a licensed health professional and therefore was categorically not authorized to dispense prescriptions to patients; accordingly, the lower courts did not err by determining that there was sufficient evidence to convict defendant of the unauthorized practice of a health profession under MCL 333.16294. However, the evidence presented in this case did not establish that defendant was aware or should have been aware that the patients at issue were Medicaid beneficiaries and that their treatment was substantially certain to cause the payment of a Medicaid benefit under MCL 400.607; therefore, defendant's convictions of Medicaid fraud were reversed.

1. MCL 333.16294 provides, in pertinent part, that except as provided in MCL 333.16215 (the delegation exception), an individual who practices or holds himself or herself out as practicing a health profession regulated by Article 15 of the Public Health Code without a license or registration is guilty of a felony. The practice of medicine is a "health profession" within the meaning of MCL 333.16294 because it is regulated and licensed under Article 15. The delegation exception outlined in MCL 333.16215(1) provides that a licensee who holds a license other than a health profession subfield license may delegate to a licensed or unlicensed individual who is otherwise qualified by education, training, or experience the performance of selected acts, tasks, or functions when the acts, tasks, or functions fall within the scope of practice of the licensee's profession and will be performed under the licensee's supervision. MCL 333.16215(1) further provides that a licensee shall not delegate an act, task, or function under MCL 333.16215 if the act, task, or function, under standards of acceptable and prevailing practice, requires the level of education, skill, and judgment required of the licensee. In this case, defendant argued that the delegation exception permitted her conduct. However, the delegation exception had no application because defendant engaged in the performance of functions that could not be delegated. Specifically, the delegation exception did not countenance defendant's issuance of prescriptions for controlled substances. Under MCL 333.17708(3), a prescription generally means an order by a prescriber to fill, compound, or dispense a drug or device, and MCL 333.17708(2) defines "prescriber," in pertinent part, as a licensed health professional. Defendant stipulated that she was not licensed to practice a health profession; therefore, defendant was categorically not authorized to dispense prescriptions to patients. Accordingly, the lower courts did not err by determining that there was sufficient evidence to convict defendant of the unauthorized practice of a health profession.

2. Under MCL 400.607(1), a person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the Social Welfare Act, MCL 400.1 *et seq.*, upon or against the state, knowing the claim to be false. To sustain a conviction for Medicaid fraud, the prosecution must therefore prove (1) the existence of a claim, (2) that the accused makes, presents, or causes to be made or presented to the state or its agent, (3) the claim is made under the Social Welfare Act, (4) the claim is false, and (5) the accused knows the claim is false. MCL 400.602(f) provides that "knowing" and "knowingly" mean that a person is in

possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit. "Knowing" and "knowingly" include acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts. Proof of specific intent to defraud is not required. Additionally, intent and knowledge can be inferred from one's actions, and when knowledge is an element of an offense, it includes both actual and constructive knowledge. The actual- or constructive-knowledge element requires knowledge of both the falseness of a claim and that the claim is substantially certain to cause payment of a benefit. In this case, a defense witness who was an employee of the clinic involved in Medicaid billing testified that defendant had no involvement in the billing process. Defendant testified that she was aware that some of the patients at the clinic were Medicaid patients but that she did not pay attention to her patients' insurance coverage. Furthermore, the prosecution presented no evidence that defendant was trained in or otherwise possessed knowledge of the clinic's billing practices. Hussain also testified that billing was not discussed with individuals who came to the clinic through the AmeriClerkships program. Therefore, the evidence in this case did not demonstrate actual or constructive knowledge that defendant's conduct was substantially certain to cause the payment of a Medicaid benefit. There was no evidence that defendant had possession of a paper chart with the patients' Medicaid status or that defendant was aware of any particular patient's insurance status. The trial court improperly imputed knowledge to defendant with regard to Medicaid billing. The critical inquiry was whether defendant had knowledge from which she was aware or should have been aware that her conduct in treating Macon and Bates was substantially certain to cause the payment of a Medicaid benefit; general knowledge that some source of insurance will be billed is simply not enough. Accordingly, the trial court's findings were speculative and not reasonably drawn inferences from the evidence that the trial court found determinative. The Court of Appeals likewise erred in its determination that defendant's general knowledge of the American healthcare system or her general knowledge that the clinic was not a free clinic provided evidence that defendant had satisfied the "knowing" element of a Medicaid fraud conviction. The evidence presented in this case did not establish that defendant was aware or should have been aware that the patients at issue, i.e., the agents, were Medicaid beneficiaries and that their treatment was substantially certain to cause the payment of a Medicaid benefit. Finally, there was no evidence presented that defendant should have familiarized herself with the insurance status of clinic patients. Therefore, the evidence did not support a finding that defendant acted in deliberate ignorance of the truth or falsity of facts or acted in reckless disregard of the truth or falsity of facts.

Defendant's conviction for the unauthorized practice of a health profession affirmed, defendant's convictions of Medicaid fraud reversed, and case remanded to the Ingham Circuit Court in accordance with the Court of Appeals' previous judgment to analyze the proportionality of the fines assessed against defendant.

Justice VIVIANO, concurring, agreed with the majority's decision to affirm defendant's conviction for unauthorized practice of a health profession and to reverse defendant's convictions for Medicaid fraud but wrote separately to raise some concerns regarding the MFCA's criminal-liability provisions. Consideration of how the MFCA developed over time, and comparison of its provisions to a somewhat analogous federal statute, the False Claims Act, 31 USC 3729(a)(1)(B), revealed a number of problematic aspects of the MFCA. The Michigan Legislature engrafted civil-liability concepts from the federal act onto preexisting language in the

MFCA without, it seems, careful thought about how and whether those concepts fit in the criminal-liability context. Justice VIVIANO therefore wrote to encourage the Legislature to consider amending the MFCA to clarify its meaning.

Justice MARKMAN, concurring in part and dissenting in part, agreed that defendant's conviction of the unlawful practice of medicine should be affirmed and that defendant did not possess actual knowledge that the agents were purporting to be Medicaid patients, but he would have affirmed defendant's convictions of Medicaid fraud in view of the definition of "knowing" set forth in MCL 400.602(f) and the appellate standard of review governing defendant's sufficiency-of-the-evidence challenge. When considering a sufficiency-of-the-evidence challenge, a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the verdict, and because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence suffices to establish the defendant's state of mind, which can be inferred from all the evidence presented. The definition of "knowing" and "knowingly" in MCL 400.602(f) mirrors the federal definition of those terms within the context of false claims against the government and includes acting in "deliberate ignorance of the truth or falsity of facts." "Deliberate ignorance" exists when the evidence indicates that the defendant, knowing or suspecting that he or she is involved in "shady dealings," takes steps to make sure that he or she does not acquire full or exact knowledge of the nature and extent of those dealings. Defendant in this case had seven years of medical training in China and studied and worked in medical-related fields since she entered the United States in 2001, including spending nine months at the Livernois Family Clinic prior to the conduct underlying her criminal conviction. Moreover, she knew of, but had not satisfied, the requirements for obtaining a license to lawfully practice medicine so as to allow billing for her services. Given her experience and her efforts to obtain a license, defendant was or should have been aware of four facts such that a reasonable trier of fact could conclude that defendant acted with deliberate ignorance of the ultimate fact that a false claim would be submitted to Medicaid as a result of her services: (1) that it was unlawful for her to practice medicine; (2) that a bill would be generated for her services, even when Dr. Hussain was not present; (3) that it was unlawful and fraudulent to bill Medicaid for her services; and (4) that a significant percentage of the clinic's patients were Medicaid recipients, such that the clinic would bill the government for her services. From these facts, a reasonable trier of fact could conclude that defendant knew that her employment at the clinic was an integral part of some illicit scheme. Defendant then avoided three readily available means of determining whether a given patient was a Medicaid patient: (1) defendant could have asked the clinic receptionist whether a patient was a Medicaid recipient, (2) defendant could have reviewed the patients' paper charts, which contained insurance information and a photocopy of their Medicaid cards, and (3) defendant could have expressly asked the patients themselves whether they were Medicaid patients. Therefore, Justice MARKMAN would have affirmed defendant's convictions of Medicaid fraud.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED May 13, 2020

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 158013

XUN WANG,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

ZAHRA, J.

Defendant was convicted after a bench trial of two counts of Medicaid fraud under MCL 400.607 and one count of unauthorized practice of a health profession under MCL 333.16294. The Court of Appeals affirmed the convictions but vacated the imposition of fines and remanded for resentencing to allow the trial court to articulate why the amount

assessed in fines was proportionate.[1]  Defendant now appeals in this Court, challenging the sufficiency of the evidence.  We affirm defendant's conviction of unauthorized practice of a health profession because defendant engaged in the nondelegable task of prescribing controlled substances.  We reverse defendant's convictions of Medicaid fraud because the evidence presented at trial and relied upon by the trial court did not support the conclusion that defendant knew or should have known that the nature of her conduct was substantially certain to cause the payment of a Medicaid benefit.[2]  Lastly, we remand this matter to the trial court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Defendant is from China, where she previously earned a medical degree and completed a two-year residency.  She moved to the United States in 2001, after which she earned a Ph.D. in basic medical science from Purdue University's veterinary school and began work as a medical researcher at the University of Michigan's medical school.  In 2013, she began a two-month student rotation through the AmeriClerkships program working in the Livernois Family Clinic, which was owned by Dr. Murtaza Hussain. After completing her student rotation, defendant volunteered at the clinic before eventually becoming a part-time employee.  Notwithstanding her education in the United States and abroad, defendant has never been licensed to practice in a health profession in this country.

---

[1] *People v Wang*, unpublished per curiam opinion of the Court of Appeals, issued May 10, 2018 (Docket No. 336673), p 9.

[2] MCL 400.607(1); MCL 400.602(f).

The Michigan Department of the Attorney General's Health Care Fraud Division discovered that a high volume of narcotics prescriptions were being written at the clinic. In 2014, the department conducted an investigation of the clinic, during which Drew Macon and Lorrie Bates, special agents with the department, separately went to the clinic while posing as patients with Medicaid benefits.

Macon went to the clinic in August 2014, posing as a new patient. He presented a Medicaid insurance card during the check-in process. When defendant called Macon into a patient room, she weighed him, took his blood pressure, and obtained information regarding the reason for his visit and his medical history. Macon informed defendant that he had attention deficit disorder and asthma, and Macon requested prescriptions for vitamin D, an inhaler, Klonopin,[3] and Adderall.[4] Defendant left the room for approximately eight minutes. When she returned, she stated that Macon would need to forward his out-of-state medical records to the office to receive Adderall and gave Macon a release form and instructions. Defendant then gave Macon prescriptions for vitamin D, Klonopin, and the inhaler. The signature on the prescriptions was Hussain's.

In December 2014, Bates went to the clinic, also posing as a new patient. A medical technician accompanied Bates into an exam room and noted Bates's complaints of headaches and insomnia. The medical technician took Bates's blood pressure, medical history, and made some written notes on a piece of paper attached to a clipboard. Taking

[3] Klonopin is the trade name of clonazepam, a Schedule 4 controlled substance. See MCL 333.7218(1)(a).

[4] Adderall is an amphetamine, a Schedule 1 controlled substance. See MCL 333.7212(1)(c).

3

the clipboard, the medical technician left after informing Bates that the doctor would be in shortly. Defendant, wearing a stethoscope and a long, white lab coat, was the next person to enter the exam room. Defendant stated that she was Hussain's assistant and asked about the reason for Bates's visit. When Bates responded that she was having difficulty sleeping and combating headaches, defendant obtained further information about these complaints. Defendant also took written notes of Bates's medical history. Defendant then asked Bates if she had taken medication for the headaches and stated that medication could be provided to help. Bates declined a Pap smear, and at that point, defendant left the room for approximately six minutes. When defendant returned, she inquired as to Bates's pharmacy preference. Bates responded, and defendant typed something into her cellular phone before informing Bates that a prescription had been sent to a pharmacy. A physical examination was then performed, in which defendant shined a flashlight into Bates's eyes and had Bates alternate standing and sitting down. When Bates asked whether defendant was a doctor, defendant responded, "No, I'm just his assistant. He's not here today." At this point, defendant gave some details about the headache medication that had just been prescribed. Defendant asked if there was "anything else," and Bates called attention to her insomnia, to which defendant replied with recommendations of taking melatonin, drinking milk before going to sleep, and spending time relaxing. Defendant added that if these techniques were unsuccessful, Bates could use a low dose of a "controlled medication." Defendant produced a prescription pad, which had been previously signed by Hussain, and wrote a prescription

4

for Ambien.[5]  Before the interaction concluded, Bates asked how long defendant had been a doctor.  Defendant responded that she had been a doctor for "one year."  Lastly, defendant offered Bates advice regarding "sleep hygiene."

Both agents' patient progress notes were entered into the clinic's computer system and were electronically signed by Hussain.  The notes indicated that both defendant and Hussain had seen the agents.  The Medicaid processing system reflected that claims were submitted for both agents' treatment and were paid to Hussain for a total of $260.

A search warrant was executed at the clinic.  There, agents found prescription pads that were presigned by Hussain.  Defendant was not present during the search, and so Bates went to defendant's home.  There, defendant agreed to speak with agents.  She stated that she was not a doctor and that she only worked under Hussain's guidance.  She added that if she saw a patient when Hussain was not in the office, she would contact him via phone so that he could make final decisions.

Defendant was charged with two counts of Medicaid fraud under MCL 400.607 and one count of unauthorized practice of a health profession under MCL 333.16294.  Defendant waived her right to a trial by jury, and a bench trial followed.  The parties stipulated that defendant had no license to practice in a health profession in 2014 or 2015 and that Hussain was not present at the clinic when Macon and Bates visited.  Defendant was found guilty of all charges.  In January 2017, the trial court sentenced her to concurrent terms of 365 days in jail for each conviction, which was suspended upon the

---

[5] Ambien, which is a brand name for Zolpidem, is a Schedule 4 controlled substance. Mich Admin Code, R 338.3123(1)(hhh); *Bloomfield Twp v Kane*, 302 Mich App 170, 184; 839 NW2d 505 (2013).

5

successful completion of five years' probation and the payment of $106,454 in fines and costs.

In her appeal of right, defendant challenged the sufficiency of the evidence supporting her convictions as well as the proportionality of her fines. In an unpublished per curiam opinion, the Court of Appeals affirmed her convictions but vacated the trial court's imposition of fines and remanded for resentencing to allow the trial court to articulate why the amount assessed in fines was proportionate.[6] Defendant now seeks leave to appeal in this Court, and on March 27, 2019, this Court entered an order directing oral argument on the application and requiring the parties to address:

> (1) whether the statutory exception in MCL 333.16294 is an element of the offense for which the prosecutor has the burden of proof, see *People v Rios*, 386 Mich 172[; 191 NW2d 297] (1971); but see *People v Langlois*, 325 Mich App 236[; 924 NW2d 904] (2018);[7] (2) if the statutory exception is an element of the offense, whether the Court of Appeals erred in holding that the evidence was sufficient to sustain the defendant's conviction under MCL 333.16294 and specifically, whether the Court of Appeals erred in concluding that the defendant's actions were consistent with the practice of medicine and therefore could not be delegated to her under MCL 333.16215; and (3) if the statutory exception is not an element of the offense, whether defense counsel was ineffective for failing to raise a delegation defense and bring the relevant statutory provisions to the trial court's attention. In addition, the appellant shall address whether the evidence was sufficient to sustain the defendant's convictions under MCL 400.607(1), and specifically whether the evidence was sufficient to show that the defendant was in possession of facts under which she was aware or

---

[6] *Wang*, unpub op at 9.

[7] We need not address this question now because defendant engaged in the performance of tasks that simply could not be delegated *at all*. Thus, whether the delegation exception is an element of the unauthorized practice of a health profession has no bearing on our opinion.

6

should have been aware that her conduct was substantially certain to cause the payment of a Medicaid benefit. See MCL 400.602(f).[8]

## II. ANALYSIS

### A. STANDARD OF REVIEW

Defendant opted for a bench trial, waiving her right to a trial by jury. Bench trials stand in sharp contrast to jury trials. A jury is required to consider all the evidence and to render a unanimous verdict, without the need for explanation.[9] In a bench trial, however, the trial court is obligated to "find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment. The court must state its findings and conclusions on the record or in a written opinion made a part of the record."[10] Because of this, reviewing courts are provided greater insight into the specific evidence found by the trial court to support verdicts in bench trials.

Defendant contends that the evidence presented at trial was insufficient to sustain her convictions. Challenges to the sufficiency of the evidence are reviewed de novo.[11] "In evaluating defendant's claim regarding the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt."[12] The prosecution submits that defendant's convictions are largely

---

[8] *People v Wang*, 503 Mich 987, 987 (2019).

[9] See MCR 6.410(B).

[10] MCR 6.403. See also *People v Legg*, 197 Mich App 131, 134; 494 NW2d 797 (1992).

[11] *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

[12] *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

supported by circumstantial evidence. "Circumstantial . . . evidence is evidence of a fact, or a chain of facts or circumstances, that, by indirection or inference, carries conviction to the mind and logically or reasonably establishes the fact to be proved."[13] Circumstantial evidence may sustain criminal convictions, but "the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation."[14]

## B. UNAUTHORIZED PRACTICE OF A HEALTH PROFESSION

Under MCL 333.16294, "[e]*xcept as provided in section 16215* [known as the delegation exception], an individual who practices or holds himself or herself out as practicing a health profession regulated by this article without a license or registration . . . is guilty of a felony."[15] The practice of medicine is a "health profession" within the meaning of MCL 333.16294 because it is regulated and licensed under the Public Health Code.[16] The delegation exception outlined in MCL 333.16215(1) provides that

> a licensee who holds a license other than a health profession subfield license may delegate to a licensed or unlicensed individual who is otherwise qualified by education, training, or experience the performance of selected acts, tasks, or functions where the acts, tasks, or functions fall

---

[13] 4 Michigan Pleading & Practice (2d ed), § 36:313, pp 69-70 (citations omitted).

[14] *Id*. at 70.

[15] Emphasis added.

[16] MCL 333.1101 *et seq*. The "practice of medicine" is defined as "the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts." MCL 333.17001(1)(j).

within the scope of practice of the licensee's profession and will be performed under the licensee's supervision. A licensee shall not delegate an act, task, or function under this section if the act, task, or function, under standards of acceptable and prevailing practice, requires the level of education, skill, and judgment required of the licensee under this article.

Defendant argues that the delegation exception permitted her conduct in this case. But the delegation exception has no application here because defendant engaged in the performance of functions that could not be delegated. Specifically, the delegation exception does not countenance defendant's issuance of prescriptions for controlled substances.

Simply stated, defendant's act of prescribing Ambien, a Schedule 4 controlled substance,[17] to Bates was a nondelegable action as a matter of law. Michigan statutory authority, while sometimes difficult to parse, supports this conclusion. A "prescription" in this state generally "means an order *by a prescriber* to fill, compound, or dispense a drug or device . . . ."[18] A prescriber, critically, means

a licensed dentist, a licensed doctor of medicine, a licensed doctor of osteopathic medicine and surgery, a licensed doctor of podiatric medicine and surgery, a licensed physician's assistant, a licensed optometrist . . . , an advanced practice registered nurse . . . , a licensed veterinarian, or another licensed health professional acting under the delegation and using, recording, or otherwise indicating the name of the delegating licensed doctor of medicine or licensed doctor of osteopathic medicine and surgery.[19]

---

[17] Mich Admin Code, R 338.3123(1)(hhh); *Bloomfield Twp*, 302 Mich App at 184.

[18] MCL 333.17708(3) (emphasis added).

[19] MCL 333.17708(2).

Defendant stipulated that she was not licensed to practice a health profession in 2014 or 2015.[20] Thus, under Michigan law, defendant was categorically not authorized to dispense prescriptions to patients. When she prescribed Ambien to treat Bates's reported difficulty sleeping, she attempted to perform a task that "requires the level of education, skill, and judgment required of" a licensed physician.[21] Such tasks are nondelegable, and the lower courts therefore did not err by determining that there was sufficient evidence to convict defendant of the unauthorized practice of a health profession.[22]

## C. MEDICAID FRAUD

Defendant next claims that the evidence was insufficient "to show that the defendant was in possession of facts under which she was aware or should have been aware that her conduct was substantially certain to cause the payment of a Medicaid benefit."[23] The Medicaid False Claim Act[24] provides that "[a] person shall not make or

---

[20] Although defendant introduced herself to Bates as Hussain's "assistant," defendant takes care to note, in her supplemental brief, that she did not say that she was a "physician assistant," which is among the types of professionals that, if licensed, may qualify as a "prescriber" under MCL 333.17708(2).

[21] See MCL 333.16215(1); MCL 333.17708(2).

[22] See MCL 333.16215(1). Defendant also raised the issue of ineffective assistance of trial counsel for failure to call the delegation exception to the trial court's attention. Of course, because defendant could not prevail under the delegation exception, trial counsel cannot have been ineffective for failing to call it to the trial court's attention. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

[23] *Wang*, 503 Mich at 987.

[24] MCL 400.601 *et seq*.

present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, *knowing* the claim to be false."[25]  To sustain a conviction for Medicaid fraud, the prosecution must therefore prove:

> (1) the existence of a claim, (2) that the accused makes, presents, or causes to be made or presented to the state or its agent, (3) the claim is made under the Social Welfare Act . . . , (4) the claim is false . . . , and (5) the accused knows the claim is false . . . .[26]

MCL 400.602(f) provides:

[25] MCL 400.607(1) (emphasis added).

[26] *People v Orzame*, 224 Mich App 551, 558; 570 NW2d 118 (1997), citing *In re Wayne Co Prosecutor*, 121 Mich App 798, 801-802; 329 NW2d 510 (1982).  Notably, the fourth and fifth elements of Medicaid fraud as outlined by *Orzame* initially required that a claim be "false, *fictitious, or fraudulent*, and . . . [that] the accused knows the claim is false, *fictitious, or fraudulent*."  *Orzame*, 224 Mich App at 558 (emphasis added).  The emphasized language stems from the original version of MCL 400.607 as enacted in 1977.  See 1977 PA 72, effective July 27, 1977; *People v American Med Ctrs of Mich, Ltd*, 118 Mich App 135, 144; 324 NW2d 782 (1982).  That language was removed, however, when MCL 400.607 was amended in 1984.  See 1984 PA 333, effective December 26, 1984; *Orzame*, 224 Mich App at 558.  Even now, after a second amendment to the statute, see 2008 PA 421, effective January 6, 2009, all that the statute requires is that a claim be "false" and that the defendant have knowledge of that falsity, without a distinction for claims that are "fictitious" or "fraudulent," as opposed to "false."  Nevertheless, Michigan courts continue to refer to the "fictitious, or fraudulent" language, which has not been a part of MCL 400.607(1) for over 30 years.  See, e.g., *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), quoting *Orzame*, 224 Mich App at 558; *Wang*, unpub op at 7.  We take this opportunity to clarify that MCL 400.607(1) now requires, as the fourth and fifth elements of a viable Medicaid fraud conviction, sufficient evidence that the claim at issue was false as defined under the Medicaid False Claim Act, MCL 400.602(d), and that the defendant possessed the requisite knowledge of that falsity.  The Legislature has indicated that there is no longer a distinction for claims that are "fictitious" or "fraudulent."

"Knowing" and "knowingly" means that a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit. Knowing or knowingly includes acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts. Proof of specific intent to defraud is not required.

With regard to the knowledge element of MCL 400.607(1) and MCL 400.602(f), the Court of Appeals has explained:

"Intent and knowledge can be inferred from one's actions and, when knowledge is an element of an offense, it includes both actual and constructive knowledge." *People v American Medical Centers of Michigan, Limited*, 118 Mich App 135, 154; 324 NW2d 782 (1982). Therefore, it is not problematic that these statutes define "knowing" to include "should be aware." Contrary to defendants' contention, this actual or constructive knowledge element does not relate solely to knowledge that a claim is filed. The knowledge element relates to both "the nature of his or her conduct *and* that his or her conduct is substantially certain to cause the payment of a [Medicaid or] health care benefit." . . . Accordingly, the actual or constructive knowledge element of these offenses appropriately requires knowledge of both the falseness of a claim and that the claim is substantially certain to cause payment of a benefit.[27]

Defense witness Darius Baty was an employee of the clinic who was involved in Medicaid billing. He testified that a patient's insurance status was known to the front desk staff, the clinical manager, and the billing staff and that a copy of a patient's Medicaid card would be included in the paper chart and could be seen if one "flipped through the paper chart." He further testified that "a good 50 percent" of the clinic's

---

[27] *People v Perez-DeLeon*, 224 Mich App 43, 48-49; 568 NW2d 324 (1997).

12

patients were Medicaid patients. Importantly, Baty added that *defendant had no involvement in the billing process*.[28]

Defendant testified that she was aware that some of the patients at the clinic were Medicaid patients, but she "never paid attention for their insurance . . . ." Defendant explained, "I have this piece of paper,[29] there's no Medicaid card on it." Defendant said that she thought that insurance information was included in the clinic's electronic medical record system but that she never looked at the medical insurance and did not know how it would be billed. Macon testified that he did not know whether defendant had any knowledge of Medicaid procedures or Medicaid billing and, significantly, the prosecution presented no evidence that defendant was trained in or otherwise possessed knowledge of the clinic's billing practices. To the contrary, defendant testified that she was never trained in billing procedures. Further, Macon could not recall seeing at any time during the investigation any documents pertaining to Medicaid procedures or billing that were signed by defendant. Bates likewise did not identify anyone who claimed that defendant was involved in the Medicaid process at all.

Hussain stated that billing was not discussed with individuals who came to the clinic through AmeriClerkships. Indeed, during the 22 years in which Hussain owned the clinic, he never trained foreign doctors like defendant in billing. Hussain explained that

---

[28] Unsurprisingly, Baty conceded that everyone, including defendant, who had contact with a patient "knew that a bill was going to be generated and sent to somebody so that the clinic could be paid for that patient visit . . . ."

[29] Defendant appears to refer to a piece of paper on which she took notes during interactions with patients. The other side of this paper contained billing codes, but defendant testified that she was unfamiliar with this side of the form.

he was not required to train individuals like defendant in billing, and so it was "never" done. Even when defendant became a paid employee—as opposed to a clerk or volunteer—she was not expected to be involved in Medicaid billing at all, and nothing presented at trial suggests that defendant was knowledgeable or in any way involved in the billing practices of her employer.

The evidence presented in this case simply does not demonstrate actual or constructive knowledge that defendant's "conduct [was] substantially certain to cause the payment of a medicaid benefit."[30] As to actual knowledge, the prosecution relies on evidence that clinic patients' charts contained their Medicaid status and copies of their cards. Nevertheless, there is no evidence that defendant had possession of the paper chart, much less that she flipped through it to find the Medicaid information. Significantly, the trial court found defendant to be credible and that she possessed a "truthful nature." Defendant's recitation of the evidence is consistent with the other evidence offered at trial—the video in particular—which appears to show that defendant had single sheets of paper on the clipboard with her in the examination room, not a multipage chart. Moreover, defendant testified that she was not aware of any particular patient's insurance status. When reviewing the sufficiency of the evidence, appellate courts must not interfere with the fact-finder's role of deciding credibility.[31]

Notwithstanding the trial court's finding that defendant was truthful and credible, the court nonetheless imputed knowledge to defendant with regard to Medicaid billing.

---

[30] See MCL 400.602(f).

[31] *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992).

The trial court on two occasions declared that "ignorance of the law" is not an excuse. But the critical question is not whether defendant knew the law. Instead, it is whether reasonable inferences can be drawn from the circumstantial evidence to conclude that defendant knew or should have known that a false claim would be submitted to the state under the Social Welfare Act. On this point the trial court found:

> There is evidence that at least half of the money—and it doesn't matter if it's half or any other portion, but I believe the testimony is or was that Livernois Family Medical Services received about half of their income from Medicaid.

This is insufficient evidence to sustain defendant's convictions. Even assuming that this statistic is accurate and that defendant was aware of it, a high percentage of Medicaid patients at the clinic does not establish that defendant had knowledge under which she was aware or should have been aware that her conduct *in treating Macon and Bates* was substantially certain to cause the payment of a Medicaid benefit.[32]

The trial court also placed great emphasis on the fact that defendant knew that the clinic would be billing an insurance company for medical care:

> [T]he form that defendant used, this encounter form, Exhibit B, is not the full form, the other side is the billing form, so defendant clearly knew that there was billing going on to insurance. That there are multiple forms of insurance. This was not her only job. She had multiple experiences. She testified to that. And she clearly knew that her paycheck was derived from insurance, that insurance was going to be billed, that that's what her paycheck was coming from, at least in part—at least in part from Medicaid.

---

[32] See MCL 400.602(f).

15

It is unremarkable that any person employed in the healthcare industry would know that a variety of insurance companies will be billed for services rendered. It is equally unremarkable that such person may infer that his or her employment is funded in part by the revenue generated by insurance billing. But such inferred knowledge does not sustain a claim for Medicaid fraud. Again, the critical inquiry is whether defendant had knowledge from which she was aware or should have been aware that her conduct *in treating Macon and Bates* was substantially certain to cause the payment of a Medicaid benefit. General knowledge that some source of insurance will be billed is simply not enough. The trial court's findings are speculative and not reasonably drawn inferences from the evidence that the trial court found determinative.

Likewise, the Court of Appeals erred in its determination that defendant's general knowledge of the American healthcare system—as a student, employee, and patient—or her general knowledge that the clinic was not a free clinic and that she was a paid employee provided evidence that defendant had satisfied the "knowing" element of a Medicaid fraud conviction. Defendant was charged with two counts of Medicaid fraud *related to claims for two specific individuals*. She cannot be held liable on the basis of the Medicaid status of other individuals treated at the clinic in its day-to-day operation.[33] Even viewed in the light most favorable to the prosecution, the evidence presented does not appear to establish that defendant was aware or should have been aware that the

---

[33] See *People v Schilling*, 110 Mich 412, 414; 68 NW 233 (1896) (a defendant cannot be convicted for crimes other than those charged in the complaint); MCL 768.32(1) (a defendant may be found guilty of an offense upon which an indictment was based or of an inferior offense to the one charged).

patients at issue were Medicaid beneficiaries and that their treatment was substantially certain to cause the payment of a Medicaid benefit.

Finally, we also conclude that there was no evidence presented that defendant should have familiarized herself with the insurance status of clinic patients. Thus, the evidence did not support a finding that defendant acted "in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts."[34] Although the prosecution's expert testified that defendant could be expected to be aware of the American healthcare model, the expert did not testify that defendant should have obtained the patients' Medicaid status before, during, or after her encounter with them. Because defendant was never trained to examine or alter billing information, and because her employer did not expect her to become familiar with this process, it cannot be said that the ignorance of Medicaid billing procedures was "deliberate" or due to "reckless disregard of the truth or falsity of facts."[35] From the evidence presented, it appears that

---

[34] MCL 400.602(f).

[35] In his partial dissent, Justice MARKMAN relies on federal caselaw to support his belief that defendant acted in deliberate ignorance of whether claims under the Social Welfare Act were false. But these cases require, for a finding of deliberate ignorance in the context of federal healthcare fraud, that the defendant be made aware of a high probability of illegal conduct and take active steps to avoid learning of it. See *United States v Delgado*, 668 F3d 219, 227 (CA 5, 2012); *United States v Lennartz*, 948 F2d 363, 369 (CA 7, 1991); *United States v Nazon*, 940 F2d 255, 259-260 (CA 7, 1991); *United States v Walter-Eze*, 869 F3d 891, 909-910 (CA 9, 2017). The same appears to be true in other contexts requiring an assessment of deliberate ignorance under federal law. See, e.g., *United States v Lara-Velasquez*, 919 F2d 946, 952-953 (CA 5, 1990); *United States v Nicholson*, 677 F2d 706, 710-711 (CA 9, 1982); *United States v Heredia (Amended Opinion)*, 483 F3d 913, 917 (CA 9, 2007). Because the evidence did not establish that defendant was required to participate in the billing process, trained in billing procedures, or lawfully required to make herself aware of individual patients' insurance information, there is no indication that defendant actively sought to remain

17

defendant was not expected to know or become aware of a patient's insurance status in the course of her duties at the clinic. We therefore hold that defendant's failure to become generally versed in billing procedures did not establish criminal culpability in this case.[36]

---

ignorant of information she knew to be likely to reveal illegal conduct. To hold otherwise would, in our view, impose a daunting standard not only on licensed healthcare professionals but also on those seeking to become licensed healthcare professionals while working under the lawful supervision of licensed doctors.

Justice MARKMAN also opines that "[w]hen defendant performed her services, the only fact unknown to [her] was whether a private insurance company or the state of Michigan would be the victim of a false claim for her unlicensed services." But Justice MARKMAN points to no evidence in support of the notion that defendant knew, at any point, that the services she provided were not lawful (whether by function of the delegation exception under MCL 333.16215(1) or otherwise). This, of course, does not shield her from her conviction for the unauthorized practice of a health profession. *People v Motor City Hosp & Surgical Supply, Inc*, 227 Mich App 209, 215; 575 NW2d 95 (1997), citing *Cheek v United States*, 498 US 192, 199; 111 S Ct 604; 112 L Ed 2d 617 (1991) (ignorance of the law is no defense from a criminal prosecution). Even so, that we affirm defendant's conviction for the unauthorized practice of a health profession does not inherently equate with a determination that she *knew* of some " 'shady dealings' that were certain to result in the generation of false bills."

[36] Justice MARKMAN offers three means by which defendant might have made herself aware of Macon's and Bates's Medicaid status: (1) she could have asked the clinic receptionist about the agents' Medicaid status, (2) she could have reviewed their paper charts, and (3) she could have asked Macon and Bates themselves whether they were Medicaid recipients. Nevertheless, the evidence in this case did not establish that defendant should have inquired as to patients' insurance status with the clinic receptionist or with the patients themselves. Thus, the mere fact that defendant *could have* asked is irrelevant. Justice MARKMAN's point about the Medicaid information in each patients' chart is well-taken, but it does not acknowledge that the evidence in this case *did not show that defendant was ever in possession of paper charts when providing care for Macon and Bates*. Additionally, the evidence did not show that, if defendant had those charts, she would have been required to flip through the charts to examine each patients' Medicaid information.

## III. CONCLUSION

For the reasons outlined in this opinion, we affirm the conviction for the unauthorized practice of a health profession but reverse the convictions for Medicaid fraud. The case shall be remanded to the Ingham Circuit Court in accordance with the Court of Appeals' previous judgment to analyze the proportionality of the fines assessed against defendant. We do not retain jurisdiction.

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                  No. 158013

XUN WANG,

      Defendant-Appellant.

_____

VIVIANO, J. (*concurring*).

      I agree with the majority's decision to affirm defendant's conviction for unauthorized practice of a health profession under MCL 333.16294 and to reverse defendant's convictions for Medicaid fraud under MCL 400.607 of the Medicaid False Claim Act (MFCA). I write separately to raise some concerns regarding the latter statute. For defendant's conduct to fall within the fraud provisions of the MFCA, the prosecution must prove that it was "knowing,"[1] which the act defines as meaning, among other things, that the defendant possesses "facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit."[2] As the majority explains, the evidence was insufficient to show that defendant knew or should have known a Medicaid payment was substantially certain to result from her conduct. At most, in my view, the record

_____

[1] MCL 400.607(1).

[2] MCL 400.602(f).

demonstrates that defendant, by recording her treatment notes and entering them into the clinic's computer system, made false records that were material to a false claim. That evidence would appear to be sufficient to establish *civil* liability under a provision in a somewhat analogous federal statute, the False Claims Act (Federal Act), 31 USC 3729(a)(1)(B). However, the MFCA—under which defendant was *criminally* prosecuted—contains no provision prohibiting the making or use of a false record that is "material to a false or fraudulent claim." Thus, the majority properly reverses defendant's Medicaid fraud convictions.

Given the scope of the parties' arguments and the evidence in the record, the result in this case is relatively clear. But in analyzing the criminal-liability provisions of the MFCA, a number of problematic aspects of the statute have become evident to me. Although they need not be resolved to dispose of this case, I write to highlight these problems and encourage the Legislature to address them in order to clarify the statute's meaning.

The problems with the MFCA result, in large part, from how the statutory language developed over time. When the MFCA was enacted in 1977 PA 72, the substantive criminal offense in MCL 400.607(1) was nearly identical to the current version. It required the defendant to have submitted a claim "knowing" it to be false.[3] "Knowing" and

---

[3] It stated:

> A person shall not make or present or cause to be made or presented to an employee or officer of the state a claim under Act No. 280 of the Public Acts of 1939, as amended, upon or against the state, knowing the claim to be false, fictitious, or fraudulent. [MCL 400.607(1), as enacted by 1977 PA 72.]

"knowingly," in turn, were defined to mean "that a person is aware of the nature of his conduct and that his conduct is substantially certain to cause the intended result."[4] The Legislature made minor changes to MCL 400.607 in 1984 PA 333, but that act significantly amended the definition of "knowing" and "knowingly" in MCL 400.602. After the 1984 amendment, the full definition read:

> "Knowing" and "knowingly" means that a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit. Knowing or knowingly does not include conduct which is an error or mistake unless the person's course of conduct indicates a systematic or persistent tendency to cause inaccuracies to be present.[5]

Under the first sentence of this section, which remains in the current version, courts have held that either actual knowledge ("is aware") or constructive knowledge ("should be aware") suffices.[6] Courts have also interpreted the section as requiring knowledge that the claim would cause payment of benefits.[7] When read in conjunction with MCL 400.607(1), "the actual or constructive knowledge element . . . requires knowledge of both the

---

[4] MCL 400.602(c), as enacted by 1977 PA 72.

[5] MCL 400.602(f), as amended by 1984 PA 333.

[6] *People v Perez-DeLeon*, 224 Mich App 43, 48-49; 568 NW2d 324 (1997), citing *People v American Med Ctrs of Mich, Ltd*, 118 Mich App 135, 154; 324 NW2d 782 (1982); see also *People v Kanaan*, 278 Mich App 594, 603; 751 NW2d 57 (2008) ("[A]ctual knowledge that a Medicaid claim is false is not required to support a conviction. Rather, a conviction can be sustained on the basis of evidence showing that a defendant should have been aware that the nature of his or her conduct constituted a false claim for Medicaid benefits, akin to constructive knowledge.").

[7] *Perez-DeLeon*, 224 Mich App at 49.

falseness of a claim and that the claim is substantially certain to cause payment of a benefit."[8]

Understanding the next round of amendments to the MFCA requires some background about the Federal Act and how it compares to the MFCA. Under the Federal Act, private parties can bring qui tam actions on behalf of the government for civil penalties and damages, which the party and the government split.[9] The MFCA, by contrast, originally relied on criminal penalties and a civil penalty (plus damages) in actions brought

---

[8] *Id.*

[9] 31 USC 3730. A qui tam action is one "brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." *Black's Law Dictionary* (10th ed).

The Federal Act had a criminal penalty, codified in 18 USC 287, that was derived from the original Federal Act passed in 1863. See *United States v Bornstein*, 423 US 303, 305 n 1; 96 S Ct 523; 46 L Ed 2d 514 (1976) (describing the history of 18 USC 287). Section 287 criminalizes making or presenting a claim knowing the claim to be false, fictitious, or fraudulent. In 1986, when Congress amended the Federal Act to define "knowing," it also amended 18 USC 287 to provide criminal penalties for making the same false claims as described in 31 USC 3729. PL 99-562, § 7; 100 Stat 3153, amending 18 USC 287. Federal courts now generally refer to 18 USC 287 as the "criminal provisions" of the Federal Act. See, e.g., *United States v Glaub*, 910 F3d 1334, 1336 (CA 10, 2018). In addition to 18 USC 287, a number of other federal statutes provide criminal penalties for healthcare fraud or related offenses. See, e.g., 18 USC 1035 (prohibiting knowingly falsifying a material fact or making a materially false statement in connection with the delivery of or payment for healthcare benefits); 18 USC 1347 (prohibiting knowingly executing or attempting to execute a scheme to defraud a healthcare benefit program or to obtain money or property owned by a healthcare benefit program by means of false pretenses, in connection with the delivery of or payment for healthcare benefits).

4

by the government.[10]  Not until 2005 did the MFCA allow for qui tam actions akin to those in the Federal Act.[11]

Another difference is that the Federal Act contains a broader liability provision in 31 USC 3729(a)(1)(B), which prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim[.]" "Material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[12]  As noted above, the MFCA does not contain a similar provision.

Like MCL 400.607(1), many of the provisions in the Federal Act contain a scienter requirement under which the defendant must act "knowingly."[13]  The Federal Act left this term undefined prior to 1986, leading many courts to require specific intent to defraud the government or actual knowledge of falsity, while others held that the knowledge element was satisfied by extreme carelessness.[14]  To bring some order to the subject, Congress enacted a definition of "knowing" and "knowingly," which still stands today.[15]  Under this new definition, no specific intent to defraud is required and knowledge can be proven in

---

[10] 1977 PA 72.

[11] 2005 PA 337; see MCL 400.610a.

[12] 31 USC 3729(b)(4).

[13] See, e.g., 31 USC 3729(a)(1)(A), (B), (F), and (G).

[14] See Boese, Civil False Claims and Qui Tam Actions (4th ed, 2019 update), § 2.06 (explaining the history and caselaw).

[15] PL 99-562, § 2, 100 Stat 3153, amending 31 USC 3729(b).

three different ways: by showing that a person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information[.]"[16]

Thus, compared to the more open-ended "constructive knowledge" standard in MCL 400.602(f), the Federal Act contains two specifically defined forms of constructive or imputed knowledge. The MFCA's constructive-knowledge standard represents a potentially broader concept, embracing "[k]nowledge that one using reasonable care or diligence should have . . . ."[17] By contrast, "reckless disregard" as used in the Federal Act has been described as a "constructive knowledge standard" requiring "aggravated gross negligence, gross negligence-plus, or conduct that runs an unjustifiable risk of harm."[18] And "deliberate ignorance"—again in the context of the Federal Act—has been thought to suggest "willful blindness."[19]

Our definition of "knowing" and "knowingly" became much more opaque when the MFCA was amended in an apparent effort to qualify for financial incentives crafted by

---

[16] 31 USC 3729(b)(1).

[17] *Black's Law Dictionary* (10th ed), p 1004; see also *Echelon Homes, LLC v Carter Lumber Co*, 472 Mich 192, 197; 694 NW2d 544 (2005) (defining constructive knowledge "as '[k]nowledge that one using reasonable care or diligence should have"), quoting *Black's Law Dictionary* (8th ed) (alteration in original).

[18] See Boese, § 2.06.

[19] *Id*. ("[T]he [Federal Act]'s 'deliberate ignorance' standard of intent and 'willful blindness' are virtually identical concepts.").

Congress in the Deficit Reduction Act of 2005.[20]  Under that act, if a state has a false-claims act that "establishes liability . . . for false or fraudulent claims described in" the Federal Act, then the state can keep 10% more of the recoveries under its own false-claims act—the additional funds coming from the share of the recovery to which the federal government would have been entitled.[21]  In other words, a state could receive 10% more from shared false-claims judgments if its false-claims act is as broad as the Federal Act. The Deficit Reduction Act charged the Inspector General of the Department of Health and Human Services with determining whether the state statute qualified.[22]  The Inspector General set out various standards it would use in this determination, including whether the state law had provisions analogous both to the federal definition of "knowing" and "knowingly" and also to the provision creating liability for false records set forth in 31 USC 3729(a)(1)(B).[23]

In 2008, in an apparent effort to satisfy the federal civil-liability standard and thereby qualify for the additional reimbursement share, our Legislature amended the intent requirement in MCL 400.602(f).[24]  But instead of adopting the Federal Act's coherent

---

[20] See generally Office of Inspector General, Dep't of Health & Human Servs, *Publication of OIG's Guidelines for Evaluating State False Claims Acts*, 71 Fed Reg 48552 (August 21, 2006).

[21] 42 USC 1396h.

[22] 42 USC 1396h(b).

[23] *OIG Guidelines*, 71 Fed Reg at 48553.

[24] 2008 PA 421; House Legislative Analysis, SB 1622 (December 11, 2008), pp 1-2 (recommending that the House of Representatives revise the definition of "knowing" and "knowingly" in MCL 400.602(f) to include "deliberate ignorance" and "reckless disregard," as defined in the Federal Act, so that the state of Michigan would be eligible

7

tripartite structure—i.e., actual knowledge, deliberate ignorance, and reckless disregard—the Legislature simply patched the latter two forms of constructive knowledge onto our existing statute (along with the disclaimer that specific intent need not be shown) and struck the language concerning errors.[25] These changes, however, failed to satisfy the Inspector General that the MFCA contained the same breadth of civil liability as the Federal Act.[26]

---

for additional federal funding). According to the legislative analysis, Michigan had already "missed out" on the extra funds because federal officials had concluded that the MFCA failed to comply with the Federal Act. *Id*. at 1. The bases for rejecting the MFCA were that it lacked a provision creating liability for false records used to decrease or avoid paying obligations to the government and that it did not allow civil penalties for *each* false claim. *OIG Evaluates 10 State False Claims Acts Under DRA; Three Statutes Meet Requirements for Incentive Allowing Increased Share of Fraud Recoveries*, 15 No. 12 FDA Enforcement Manual Newsletter 7 (2007).

Noting the legislative history here is not the same as using it to interpret the statute. If anything, the legislative analysis shows the perils of relying on these types of materials: it expressed a view of the Legislature's purpose that does not appear to be reflected in the statutory text, at least according to the Inspector General. This disjunction between the text and the legislative history is why we examine what the statute says rather than what the legislators intended it to say as evidenced by extrinsic documents. See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 375 ("[T]he use of legislative history poses a major theoretical problem: It assumes that what we are looking for is the intent of the legislature rather than the meaning of the statutory text. That puts things backwards. To be 'a government of laws, not of men' is to be governed by what the laws *say*, and not by what the people who drafted the laws intended."); Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv J L & Pub Pol'y 59, 61 (1988) ("Original meaning is derived from words and structure . . . . What any member of Congress thought his words would do is irrelevant. We do not care about his mental processes.").

[25] 2008 PA 421.

[26] Letter from Office of Inspector General to Attorney General Mike Cox (March 21, 2011), available at <https://oig.hhs.gov/fraud/docs/falseclaimsact/Michigan.pdf> [https://perma.cc/V56Y-BB57]. Michigan received supplemental letters, one in 2011 and another in 2016, offering additional reasons why the MFCA was not certified. See Letter from Office of Inspector General to Attorney General Bill Schuette (December 28, 2016),

While few details were given in the Inspector General's 2011 official letter notifying the Michigan Attorney General that the state was ineligible for the additional reimbursement share under the Deficit Reduction Act, it did cite the Federal Act's broad definition of "material" as contrasting with the MFCA.[27]

In sum, civil-liability concepts from the Federal Act have been engrafted onto preexisting language in the MFCA without, it seems, careful thought about how and whether those concepts fit in the criminal-liability context. To make matters worse, the MFCA's old language already created a number of interpretive puzzles. The combined product is even more difficult to parse.

First, the initial sentence of MCL 400.602(f), defining "knowing" and "knowingly," is incomplete. It refers to knowledge of the "nature of [an individual's] conduct" without clearly expressing what the "nature" of the "conduct" relates to. Only by reading it together with MCL 400.607(1)—when that offense is at issue—can the terms in the first sentence be linked to the falsity of the claim, i.e., knowledge that the claim is false.[28] Certainly it seems that the Legislature intended such a reading. But incorporating the full definition of "knowing" into MCL 400.607(1)—"knowing the claim to be false"—makes the statute

---

available at <https://oig.hhs.gov/fraud/docs/falseclaimsact/Michigan-supplement2.pdf> [https://perma.cc/RWL4-WXBM] (explaining that the MFCA did not provide for the same increased civil penalties as the Federal Act); Letter from Office of Inspector General to Attorney General Bill Schuette (August 31, 2011), available at <https://oig.hhs.gov/fraud/docs/falseclaimsact/Michigan-supplement.pdf> [https://perma.cc/H7EG-HMDL] (noting differences in the statutes of limitations).

[27] Letter from Office of Inspector General to Attorney General Mike Cox (March 21, 2011).

[28] See *Perez-DeLeon*, 224 Mich App at 49.

9

difficult to comprehend, to say the least.[29] As one example, the critical element here—certainty about the Medicaid payment—becomes an element of the offense despite lacking any clear grammatical or logical connection to the phrasing of MCL 400.607(1).

Second, a related question is whether the first sentence of MCL 400.602(f) encompasses the full breadth of the actual- and constructive-knowledge standards. The phrasing—"is aware" or "should be aware"—suggests that it does. But again, these phrases refer to awareness regarding the "nature" of the individual's "conduct," not specifically the falsity of the individual's Medicaid claim. In this respect, the Federal Act's clarity in establishing three ways to demonstrate knowledge contrasts with the MFCA's less direct language. Moreover, if the first sentence covers constructive knowledge—what the individual should have known in the exercise of reasonable diligence—then it is not apparent what meaning is added by the second sentence introducing "reckless disregard" and "deliberate ignorance." Those two standards would already seem to fall within the broader concept of constructive knowledge in the first sentence.

Third, in defining "reckless disregard" and "deliberate ignorance," it is unclear what role is played by the existence of both criminal and civil provisions in the MFCA, as compared to the civil provisions in the Federal Act. If "reckless disregard" bears a meaning

---

[29] Consider substituting in just a portion of the term's definition: "A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act . . . [a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit] the claim to be false." MCL 400.602(f); MCL 400.607(1). That the definition was not written to fit the syntax of the sentence is one of the more obvious problems with the definition.

similar to that in the Federal Act, and thus focuses on disregard of a substantial or unjustified risk, how does this meaning work with the phrase "substantial certainty"?[30] Does "reckless disregard" mean reckless disregard of a substantial and unjustified risk that a defendant's conduct will result in payment of a false claim, or does it mean reckless disregard (i.e., disregard of a substantial risk) of a substantial certainty that the conduct will result in payment of a false claim? If the latter, what sort of probabilistic assessment would be required, diluted by two layers of "substantial" risks or certainties? For that matter, what degree of certainty is signified by the phrase "substantial certainty"?

Fourth, with regard to MCL 400.607(1), what does it mean to "cause" a false claim to be made or presented? Does this term incorporate a common-law definition of causation?[31] And if "cause" is modified by "knowing," how does the definition of "knowing" in MCL 400.602(f), which already contains its own causal requirement linked to actual payment, fit into MCL 400.607(1)? Compounding this issue is the definition of "deceptive," which also contains language concerning causation. That term comes into play through the definition of "false," which "means wholly or partially untrue or deceptive."[32] "Deceptive," in turn, "means making a claim or causing a claim to be made under the social welfare act" containing statements or omissions that mislead the government into thinking "the represented or suggested state of affair to be other than it

---

[30] See Boese, § 2.06.

[31] Cf. *Ray v Swager*, 501 Mich 52, 63-69; 903 NW2d 366 (2017) (holding that the Legislature used "proximate cause" as a legal term of art, borrowing its lengthy background in the caselaw).

[32] MCL 400.602(d).

11

actually is."[33]  Thus, in the context of MCL 400.607(1), three potentially different causal requirements might apply at the same time.  In this respect, a comparison to 31 USC 3729(a)(1)(B) demonstrates the issues with our statute.  That provision of the Federal Act includes nearly identical phrasing—"causes to be made or used"—but does not again refer to causation in the definitions of other pertinent terms.  Instead, 31 USC 3729(a)(1)(B) employs the term "material," which, as noted before, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[34]

These are hard interpretive questions that could arise in future MFCA cases and may lead to a vagueness challenge or rule-of-lenity argument.  I offer no view on them here, except to say that they are best resolved by the Legislature.  For these reasons, I concur in the judgment and encourage the lawmaking branch to consider amending the statute to clarify its meaning.

David F. Viviano

---

[33] MCL 400.602(c).

[34] 31 USC 3729(b)(4).

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

       No. 158013

XUN WANG,

       Defendant-Appellant.

_____

MARKMAN, J. (*concurring in part and dissenting in part*).

I concur with the majority to affirm defendant's conviction of the unlawful practice of medicine. I further concur with its conclusion that defendant here did not possess actual knowledge that Special Agents Macon and Bates were purporting to be Medicaid patients. Where I respectfully depart from my colleagues concerns whether there was sufficient evidence to allow a reasonable trier of fact to conclude that defendant here acted in "deliberate ignorance" of the special agents' putative Medicaid status in providing unlicensed services for which no bill could lawfully be generated. In view of the distinctive definition of "knowing" set forth in MCL 400.602(f) and the appellate standard of review governing defendant's sufficiency-of-the-evidence challenge, I would affirm defendant's convictions under the Medicaid False Claim Act (MFCA), MCL 400.601 *et seq*.

# I. BACKGROUND

I adopt the majority's recitation of the factual and procedural history of this case. As defendant's experience within the healthcare field is relevant to the knowledge element of her convictions under the MFCA, I briefly summarize that experience.

Before moving to the United States in 2001, defendant completed a five-year medical-school program in China as well as two of three years of a residency program in internal medicine. Defendant then entered the United States to pursue studies at Purdue University, earning a Ph.D. in Basic Medical Science. Upon completing her studies, defendant worked as a medical researcher at the University of Michigan Medical School and then at William Beaumont Hospital. In 2013, through the AmeriClerkships program, defendant rotated through four primary-care clinics. Thereafter, AmeriClerkships placed defendant at the Livernois Family Medical Clinic (LFMC), run by Dr. Murtaza Hussain. Defendant then rotated through all five clinics as an unpaid volunteer, doing so to gain experience and additional personal references in support of her applications to United States medical-residency programs. During her two-month rotation at LFMC, defendant performed the functions of a medical student on an outpatient rotation, including taking patient histories and performing initial physical examinations. Defendant performed these basic tasks while Dr. Hussain was present in the clinic.

In early 2014, defendant failed to obtain a United States residency placement. She did, however, continue to work at LFMC, first as a volunteer and then as a part-time and paid employee. When Special Agent Macon purported to be an LFMC patient, defendant had spent a total of nine months at the clinic, was working there 10 to 15 hours a week, and was earning between $20 and $30 an hour. Defendant saw 10 to 15 patients a day

2

when Dr. Hussain was absent from the clinic. Finally, defendant saw patients even while Dr. Hussain was vacationing abroad.

## II. STANDARD OF REVIEW

The standard of review for evaluating sufficiency-of-the-evidence challenges following jury trials and bench trials are one and the same. *People v Petrella*, 424 Mich 221, 268-269; 380 NW2d 11 (1985). Thus, the fact that defendant's convictions arise from a bench trial does not alter the basic legal framework governing our review of her sufficiency-of-the-evidence challenge. *Id*.

When considering a sufficiency-of-the-evidence challenge, "this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). "[I]mportantly, the standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the . . . verdict. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (brackets, quotation marks, and citation omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Oros*, 502 Mich at 239 (quotation marks and citation omitted). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as

3

knowledge and intent, *minimal circumstantial evidence will suffice* to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008) (emphasis added).

## III. DISCUSSION

Under the MFCA, "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act . . . upon or against the state, knowing the claim to be false." MCL 400.607(1). In order to sustain a conviction under MCL 400.607(1), the prosecutor must prove five elements:

> "(1) the existence of a claim, (2) that the accused makes, presents, or causes to be made or presented to the state or its agent, (3) the claim is made under the Social Welfare Act . . . , (4) the claim is false . . . , and (5) the accused knows the claim is false . . . ." [*Kanaan*, 278 Mich App at 619, quoting *People v Orzame*, 224 Mich App 551, 558; 570 NW2d 118 (1997).]

Defendant's sufficiency-of-the-evidence challenge centers on whether the prosecutor established the fifth element-- knowledge that the claim is "false." This element pertains to "both the nature of [defendant's] conduct and that [defendant's] conduct is substantially certain to cause the payment of a [false Medicaid or] health care benefit." *People v Perez-DeLeon*, 224 Mich App 43, 49; 568 NW2d 324 (1997) (emphasis and quotation marks omitted). The MFCA provides the following specific definition for "knowing" and "knowingly":

> [A] person is in possession of facts under which he or she is aware or *should be aware* of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a medicaid benefit. Knowing or knowingly includes acting in *deliberate ignorance of the truth or falsity of facts* or acting in reckless disregard of the truth or falsity of

4

facts. Proof of specific intent to defraud is not required. [MCL 400.602(f) (emphasis added).]

In my judgment, the highlighted aspects of this definition emphasize that an individual may not disregard readily ascertainable facts that would otherwise cause that individual, in light of other facts of which he or she is aware, or should be aware, to recognize that a claim made upon the government under the Social Welfare Act is false.[1] To be sure, the MFCA does not define "deliberate ignorance." See MCL 400.602. However, the definitions of "knowing" and "knowingly" are modeled after and mirror the federal definitions of those terms within the context of false claims against the government. Compare, e.g., MCL 400.602(f) with 31 USC 3729(b)(1).[2] And, under federal law, a finding of "deliberate ignorance" is appropriate when (1) the defendant claims a lack of guilty knowledge; (2) "the defendant was subjectively aware of a high

---

[1] I emphasize "government" because the victims of defendant's actions were not only the patients at LFMC who had every reason to believe they were receiving care from a licensed medical professional, see note 5 *infra*, but also the taxpayers of this state.

[2] The federal statute, 31 USC 3729(b)(1), states:

> (1) the terms "knowing" and knowingly"—
>
> (A) mean that a person, with respect to information—
>
> (i) has actual knowledge of the information;
>
> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud[.]

5

probability of the existence of the illegal conduct"; and (3) "the defendant purposely contrived to avoid learning of the illegal conduct." *United States v Delgado*, 668 F3d 219, 227-228 (CA 5, 2012) (quotation marks and citation omitted); see also *United States v Walter-Eze*, 869 F3d 891, 910 (CA 9, 2017) (describing "deliberate ignorance" as existing "where the defendant remained willfully ignorant of the nature of his activity after the circumstances would 'have put any reasonable person on notice that there was a "high probability" that the conduct was illegal' "), quoting *United States v Nicholson*, 677 F2d 706, 710 (CA 9, 1982) (brackets omitted). A defendant acts with "deliberate ignorance" when the defendant has a reasonable basis to suspect that her actions run afoul of the law but does not know the precise nature of the criminal conduct. *United States v Lara-Velasquez*, 919 F2d 946, 952-953 (CA 5, 1990) (finding sufficient evidence to establish that the defendant acted with deliberate ignorance when he had reason to suspect he was transporting illicit cargo but avoided inspecting the vehicle he drove). Equating "deliberate ignorance" to "conscious avoidance" has also gained widespread approval in the federal circuit courts. *United States v Nazon*, 940 F2d 255, 259 (CA 7, 1991). A defendant acts with "deliberate ignorance" when she intentionally takes "actions to avoid confirming suspicions of criminality." *United States v Heredia*, 483 F3d 913, 917 (CA 9, 2007). The Seventh Circuit has arguably summed up "deliberate ignorance" in a manner most relevant to this case, stating that "[d]eliberate ignorance exists when the evidence indicates that the defendant, knowing or suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v Lennartz*, 948 F2d 363, 369 (CA 7, 1991) (quotation marks and citation omitted).

6

Given that defendant was, or should have been, aware of the following four facts, a reasonable trier of fact could conclude that defendant acted with "deliberate ignorance" of the ultimate fact that a false claim would be submitted *to Medicaid* as a result of her services. First, based on defendant's experience in the healthcare field and her efforts to obtain a residency placement and an accompanying medical license, defendant was aware, or should have been aware, that it was unlawful for her to practice medicine. This is particularly true given that defendant provided medical services even while Dr. Hussain was more than 5000 miles away in Greece.[3] Second, as acknowledged by the majority, Darius Baty, an employee in LFMC's billing department, testified that everyone at LFMC "knew that a bill was going to be generated [for each patient visit] and sent to somebody so that the clinic could be paid for that patient visit . . . ." And defendant's knowledge of this specific point is lent further support by the fact that she was receiving compensation for her work at LFMC. For when defendant was the sole person seeing a patient-- as was the case, for example, with Special Agent Bates-- and LFMC was paying her, it follows that defendant knew that LFMC would prepare and submit a bill for the visit. Third, based on her considerable history in the healthcare field, defendant was

---

[3] The majority asserts that I have not identified any "evidence in support of the notion that defendant knew, at any point, that the services she provided were not lawful . . . ." But as the above discussion reflects, her experience in the medical field in combination with her unsuccessful efforts to obtain a medical license provided a trier of fact with a reasonable basis to conclude that she was cognizant that she could not practice medicine and write prescriptions while Dr. Hussain was not at LFMC. This is particularly true given that this Court must view the evidence in the light most favorable to the prosecutor and given that defendant's criminal state of mind is subject to the specific standards of MCL 400.602(f).

aware, or should have been aware, that a bill could not be sent to Medicaid or any insurance company for services rendered by an individual who lacked any type of professional medical license and thus could not lawfully practice in the field.[4]  Fourth, defendant was aware, or should have been aware, that a high percentage of the patients specifically seeking treatment at LFMC were Medicaid beneficiaries.  From her nine months of experience at LFMC, she possessed at least a basic understanding of the clinic's patient population.  Indeed, defendant acknowledged during cross-examination that she was cognizant that at least some of the patients at LFMC were Medicaid patients.  Furthermore, Baty quantified the percentage of patient visits resulting in bills to Medicaid, estimating that "a good 50 percent" of LFMC's patients were Medicaid recipients.

To summarize, a reasonable trier of fact could have concluded that defendant was aware, or should have been aware: (1) that it was unlawful for her to practice medicine;

---

[4] The majority states that "[b]ecause the evidence did not establish that defendant was required to participate in the billing process, trained in billing procedures, or lawfully required to make herself aware of individual patients' insurance information, there is no indication that defendant actively sought to remain ignorant of information she knew to be likely to reveal illegal conduct."  One need not, however, partake in the billing process or be trained in billing procedures to know that it is fraudulent to bill for services that the majority, in upholding defendant's unlawful-practice-of-medicine conviction, correctly concludes defendant could not legally perform.  When defendant performed her services, the only fact unknown to defendant was whether a private insurance company or the state of Michigan would be the victim of a false claim for her unlicensed services.  Thus, by knowing that she could not practice medicine and that a bill would be generated for her services, defendant knew or should have known that she was engaged in "shady dealings" that were certain to result in the generation of false bills.  This is perhaps made most apparent by her decision to treat patients even while Dr. Hussain was vacationing in Greece.  And as discussed in point four *infra*, defendant knew or should have known that there was a high probability that the state of Michigan specifically would be the victim.

(2) that a bill would be generated for her services, even when Dr. Hussain was not present; (3) that it was unlawful and fraudulent to bill Medicaid for her services; and (4) that a significant percentage of LFMC patients were Medicaid recipients, such that LFMC would bill the government for her services. From these facts, a reasonable trier of fact could conclude that defendant knew that her employment at LFMC was an integral part of an illicit scheme. Further, such a reasonable trier of fact could also conclude that defendant knew that on the occasions on which Special Agents Macon and Bates visited, there was approximately-- arguably at least-- a one-in-two chance that her "treatment" of any given patient would cause LFMC to submit a false claim to Medicaid. Put another way, because defendant testified that she saw 10 to 15 patients on days when Dr. Hussain was not present at LFMC, her services on those days caused, on average, the submission of five to eight false bills to Medicaid.[5]

Despite this high probability and volume of false bills to Medicaid resulting from defendant's "treatment" of patients, defendant avoided *three* readily available means of determining whether a given patient, such as Special Agents Macon or Bates, was a Medicaid patient. First, she could have asked the clinic receptionist, who was cognizant of a given patient's insurance information, whether a patient was a Medicaid recipient. Second, she could have reviewed their paper charts, which contained insurance information, including a photocopy of their Medicaid cards. Third, she could have

---

[5] Quantified differently, if 50% of LFMC patients were Medicaid recipients and Wang saw 10 patients on a day when Dr. Hussain was not at LFMC, there was a greater than 99.9% chance that her work at LFMC on that day would have resulted in the clinic sending a false Medicaid bill to the government.

expressly inquired whether they were Medicaid recipients. Rather than determining whether a patient was or was not a Medicaid recipient, defendant simply closed her eyes to this information, all the while knowing that bills would be generated and submitted to the government for the unlawful services that she had provided.[6] In my judgment, the four facts of which defendant was aware, or should have been aware, combined with her avoidance of readily ascertainable information regarding a patient's Medicaid status, amount to "deliberate ignorance" of the ultimate fact that her "treatment" of the special agents would cause the submission of false claims to Medicaid.[7]

---

[6] Apart from the requirement placed upon defendant by the MFCA, knowing a patient's insurance status, particularly when treating a patient of limited financial means who is on Medicaid, is relevant to devising a treatment plan and selecting a prescription-medication regimen. See Schneider & Hall, *The Patient Life: Can Consumers Direct Health Care?*, 35 Am J L & Med 7, 33-34 & nn 130, 132 (2009) (discussing studies showing that doctors "routinely consider [an] insured patient's out-of-pocket costs in some clinical situations, especially when prescribing drugs" and observing that knowing a patient's insurance status and financial limitations influenced treatment plans and what specific medications doctors prescribed). Thus, defendant's decision to avoid learning of a patient's Medicaid status not only caused a false claim to be submitted to Medicaid but also arguably impacted the specific care received by patients at LFMC. For this latter reason, I respectfully disagree with the majority that because defendant was not herself involved in billing procedures, she had no particular need or reason to learn of a patient's insurance status.

[7] The majority contends that while defendant could have asked about a patient's insurance status, nothing shows that defendant either possessed a patient's paper chart or would have looked through the paper chart to determine a patient's insurance status had she possessed one. But it is not a question of what defendant did or would have done. Rather it is a question of what the law required of her in light of the facts that she knew or should have known. Because defendant knowingly involved herself in "shady dealings" that were certain to result in some type of false billing, a trier of fact could rely on the "deliberate ignorance" standard for establishing knowledge and return a guilty verdict by reasonably inferring that defendant intentionally avoided learning a given patient's insurance status and, in turn, that her treatment of that patient would result in Medicaid fraud. Certainly, as evidenced from the three ways by which defendant could have

## IV. CONCLUSION

Defendant was aware that a large percentage of patients at LFMC were Medicaid patients such that her actions would cause the submission of false bills to Medicaid but acted with "deliberate ignorance" of the readily ascertainable fact that Special Agents Macon and Bates were Medicaid patients and thus that false governmental claims were being generated under the Social Welfare Act.  Therefore, I respectfully dissent from the portion of the majority's opinion vacating defendant's convictions under the MFCA.

Stephen J. Markman

---

learned a patient's Medicaid status, the information was readily accessible.  But, of course, had defendant taken the few moments necessary to learn a patient's Medicaid status and then declined to provide services to the patient, there is a reasonable question whether she would have been able to maintain her employment at LFMC, and it is not inappropriate that this also be considered by the trier of fact.